**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

AMIRA NATURE FOODS, LTD.,

                   Plaintiff,

     v.

PRESCIENCE POINT LLC, PRESCIENCE
PARTNERS, LP, PRESCIENCE
INVESTMENT GROUP LLC, PRESCIENCE
CAPITAL, LLC,  EIAD ASBAHI,

                  Defendants.

Case No. 15-CV-09655(VEC)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS PRESCIENCE POINT
LLC, PRESCIENCE PARTNERS, LP, PRESCIENCE INVESTMENT GROUP LLC,
PRESCIENCE CAPITAL, LLC AND EIAD ASBAHI'S
MOTION TO DISMISS THE AMENDED COMPLAINT**

Michael A. Asaro
Douglass B. Maynard
Katherine Porter
Sydney Spector
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036

*Counsel for Defendants Prescience Point LLC,
Prescience Partners, LP, Prescience Investment
Group LLC, Prescience Capital LLC and Eiad
Asbahi*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................................1

SUMMARY OF ALLEGATIONS ..............................................................................................2

ARGUMENT ..................................................................................................................................5

I.      MOTION TO DISMISS STANDARD ......................................................................5

II.     PLAINTIFF FAILS TO PLEAD A CLAIM FOR DEFAMATION............................5

     A.     Expressions of Opinion Are Constitutionally Protected ....................................6

     B.     Courts Focus on the Context as a Whole, Not Discrete Factual Assertions ...........7

     C.     The February and July Reports Are Protected Opinion ..................................9

     D.     Plaintiff's Allegations Fail To Support a Defamation Claim ................................11

           1.     International Revenue ..............................................................................11

           2.     Domestic Revenue ..................................................................................14

           3.     Related Party Transactions......................................................................15

           4.     "Sham" Real Estate Transaction .............................................................17

           5.     Other "Red Flag" Issues.........................................................................17

     E.     Plaintiff Fails To Plead Actual Malice with Sufficient Facts................................18

     F.     Plaintiff's Defamation by Implication Claim Fails............................................19

III.    PLAINTIFF FAILS TO PLEAD A TRADE LIBEL CLAIM ....................................19

     A.     The Claim Is Based on Opinion and Plaintiff Fails To Plead Actual Malice.........19

     B.     The Challenged Reports Do Not Impugn Amira's Products.................................20

     C.     Plaintiff Fails To Plead Special Damages ..........................................................20

IV.    PLAINTIFF FAILS TO PLEAD A SECURITIES EXCHANGE ACT CLAIM........21

     A.     Plaintiff Lacks Standing........................................................................................21

     B.     The Injunction Sought Would Be Unconstitutional..............................................21

     C.     Plaintiff Fails To Plead a Section 10(b) Claim.....................................................22

           1.     Plaintiff Fails To Allege any Material Misrepresentation ..........................22

           2.     Plaintiff Fails To Allege Scienter ...........................................................23

           3.     Plaintiff Fails To Allege Reliance ...........................................................24

           4.     Plaintiff Fails To Allege Causation .........................................................25

CONCLUSION ...................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Angio-Med. Corp. v. Eli Lilly & Co.*,
    720 F. Supp. 269 (S.D.N.Y. 1989) .......................................................................20

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .........................................................................................5

*Bell Atl.Corp. v. Twombly*,
    550 U.S. 544 (2007) .........................................................................................5

*Biro v. Condé Nast*,
    963 F. Supp. 2d 255 (S.D.N.Y. 2013) .........................................................5, 18, 19

*Blue Chip Stamps v. Manor Drug Stores*,
    421 U.S. 723 (1975) .......................................................................................21

*Brian v. Richardson*,
    87 N.Y.2d 46, 637 N.Y.S.2d 347 (1995) .................................................6, 7, 8, 10

*Bilinski v. Keith Haring Found., Inc.*,
    632 F. App'x 637 (2d Cir. 2015) ......................................................................20

*Cartica Mgmt., LLC v. Corpbanca, S.A.*,
    50 F. Supp. 3d 477 (S.D.N.Y. 2014) ..................................................................21

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014) .............................................................................24

*Cohen v. Stevanovich*,
    722 F. Supp. 2d 416 (S.D.N.Y. 2010) .................................................................24

*Diario El Pais, S.L. v. The Nielsen Co.*,
    No. 07CV11295(HB), 2008 WL 4833012 (S.D.N.Y. Nov. 6, 2008) .......................20

*Dillon v. City of New York*,
    704 N.Y.S.2d 1 (1st Dep't 1999) .....................................................................5, 6

*Drug Research Corp. v. Curtis Publ'g Co.*,
    7 N.Y.2d 435, 199 N.Y.S.2d 33 (1960) ..........................................................19, 20

*Egiazaryan v. Zalmayev*,
    880 F. Supp. 2d 494 (S.D.N.Y. 2012) ...........................................................6, 7, 18

*Global Intellicom, Inc. v. Thomson Kernaghan & Co.*,
    No. 99 CIV 342 (DLC), 1999 WL 544708 (S.D.N.Y. July 27, 1999) ......................21

*Harris v. AmTrust Fin'l Servs., Inc.*,
   135 F. Supp. 3d 155, 173 (S.D.N.Y. 2015)........................................................23, 25

*Henneberry v. Sumitomo Corp. of Am.*,
   415 F. Supp. 2d 423 (S.D.N.Y. 2006)..........................................................20

*Herbert v. Lando*,
   781 F.2d 298 (2d Cir. 1986)........................................................19

*Immuno AG. v. Moor-Jankowski*,
   77 N.Y.2d 235, 566 N.Y.S.2d 906 (1991) ........................................6, 7, 8

*JBCHoldings NY, LLC v. Pakter*,
   931 F.Supp.2d 514 (S.D.N.Y.2013)........................................................16

*Koulkina v. City of New York*,
   559 F.Supp.2d 300 (S.D.N.Y. 2008)........................................................3

*Lattanzio v. Deloitte & Touche LLP*,
   476 F.3d 147 (2d Cir. 2007)........................................................22

*Mann v. Abel*,
   10 N.Y.3d 271, 856 N.Y.S.2d 31 (2008) ........................................8, 11

*Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. and Rest. Emps. Int'l Union*,
   239 F.3d 172 (2d Cir. 2001)........................................................21

*Nanoviricides, Inc. v. Seeking Alpha, Inc.*,
   Index No. 151908/2014, 2014 N.Y. Misc. LEXIS 2909 (N.Y. Sup. Ct. Jun. 26,
   2014) ........................................................8

*Neb. Press Ass'n v. Stuart*,
   427 U.S. 539 (1976)........................................................21

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964)........................................................6

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015)........................................................22

*Reliance Ins. Co. v. Barron's*,
   442 F. Supp. 1341 (S.D.N.Y. 1977)........................................................6, 18, 22

*Russo v. Bruce*,
   777 F. Supp. 2d 505 (S.D.N.Y. 2011)........................................................24

*Sabratek Corp. v. Keyser*,
   No. 99 CIV. 8589 (HB), 2000 WL 423529 (S.D.N.Y. Apr. 19, 2000)....................7, 8, 16, 24

*Sandals Resorts Int'l Ltd. v. Google, Inc.*,
  925 N.Y.S.2d 407 (1st Dep't 2011) ...................................................................7, 10

*Silvercorp Metals Inc. v. Anthion Mgmt. LLC*,
  959 N.Y.S.2d 92, 2012 WL 3569952 (N.Y. Sup. Ct. 2012) .....................................8, 9, 10, 19

*St. Amant v. Thompson*,
  390 U.S. 727 (1968) ........................................................................................18

*Steinhilber v. Alphonse*,
  68 N.Y.2d 283, 508 N.Y.S.2d 901 (1986) .........................................................6, 7

*Stepanov v. Dow Jones & Co.*,
  987 N.Y.S.2d 37 (1st Dep't 2014) .....................................................................19

*Tellabs, Inc. v Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)....................................................................................23, 24

*Themed Restaurants, Inc. v. Zagat Survey, LLC*,
  801 N.Y.S.2d 38 (1st Dep't 2005) .....................................................................19

*Tiberius Capital, LLC v. PetroSearch Energy Corp.*,
  No. 09 CV. 10270, 2011 WL 1334839 (S.D.N.Y. Mar. 31, 2011).........................................25

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016)..........................................................................22, 23

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
  425 U.S. 748 (1976) .........................................................................................6

*Vengroff v. Coyle*,
  647 N.Y.S.2d 530 ...........................................................................................10

*Waste Distillation Tech., Inc. v. Blasland & Bouck Eng'rs, P.C.*,
  523 N.Y.S.2d 875 (2d Dep't 1988)......................................................................20

**Statutes**

15 U.S.C. § 78u-4(b)(2)(A).................................................................................22

Fed. R. Civ. P. 9(b) .........................................................................................22

Fed. R. Civ. P. 12(b)(1)......................................................................................1

Fed. R. Civ. P. 12(b)(6).......................................................................................1

Prescience Point LLC (Prescience Point Research Group) ("PPRG"), Prescience Partners, LP, Prescience Investment Group LLC, Prescience Capital, LLC and Eiad Asbahi (collectively, the "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6).

## PRELIMINARY STATEMENT

In an effort to stifle public criticism of its business, Plaintiff Amira Nature Foods, Ltd. brings this action, asserting claims for defamation, trade libel and securities fraud.  Revealing its true purpose, Amira even seeks a permanent injunction – which would be an unconstitutional prior restraint of speech – to prevent Defendants from publishing any future statements about Amira that the company might consider false and defamatory.

The effort fails, however, and the Amended Complaint should be dismissed.

Amira complains of PPRG's statements that Amira has overstated its revenues, planned a sham real estate transaction and engaged in other misconduct.  The challenged statements are genuinely held opinions based on facts and analysis that are fully disclosed in two research reports that PPRG published on the internet.  Those reports are part of a public debate, in which Amira has participated, about Amira's financial condition and the value of its stock.  In fact, the Amended Complaint, with its hyper-detailed rebuttal of PPRG's research reports, amounts to nothing more than a defense of Amira's stock and a critique of PPRG's negative opinions.  The exchange of such opinions, both positive and negative, is the life blood of an open society and our economic system.  For that reason, the reports at issue are constitutionally protected opinion and cannot form the basis of a defamation claim.

Plaintiff's defamation claim also fails because the factual allegations do not demonstrate the constitutionally required showing of actual malice. The other claims of trade libel and

securities fraud suffer from a multitude of flaws as set forth below and should be dismissed.

## SUMMARY OF ALLEGATIONS

Amira is a publicly-traded company that produces, distributes and sells rice products in India and internationally. The majority of Amira's revenue comes from the sale of Basmati rice. Its stock trades on the New York Stock Exchange.  Amended Complaint ("AC") ¶¶ 1, 9, 27.

PPRG researches a variety of public companies – including multi-billion dollar companies – looking to uncover fraudulent or misleading business practices.  Asbahi is the co-founder of PPRG and the founder of the other Defendants.  *Id.* ¶¶ 2, 10-14, 36.

Amira alleges that the Defendants drove down Amira's stock price by publishing false statements about Amira's financial condition and reporting practices. Specifically, Amira challenges the contents of two research reports that PPRG published in February and July 2015. *Id.* ¶¶ 1-2, 14; *id.* Exs. 1 and 2 ("Feb. Rpt." and "July Rpt.," and collectively, the "Reports").

### *The February Report*

The February Report presented PPRG's considered opinion that Amira was overstating its revenue, and that there were other indications of serious mismanagement. The Report discloses the facts and analysis that formed the basis for its conclusions. The reader is given raw financial data, links to underlying material, results of interviews and the means of analysis and thus can independently assess PPRG's research opinions; indeed readers are encouraged to do so.

PPRG reasoned, based on Amira's business model, that all international Basmati rice sales would be reported to India's Agricultural & Processed Food Products Export Development Authority ("APEDA") and thus Amira's international Basmati revenue should be consistent with its APEDA-reported sales.  Feb. Rpt. at 7. While Amira does not separately disclose its international Basmati revenue, it does report international/domestic revenue and Basmati/non-Basmati revenue.  As fully described in its Reports, PPRG used that information to estimate

2

Amira's international Basmati rice sales, and then compared the result to the APEDA numbers. *See* AC ¶¶ 26-27, 63; Feb. Rpt. at 8-9. PPRG analyzed the matter in two ways: (1) a ratio of international to domestic Basmati sales based on the ratio applicable to all rice sales, and (2) the assumption that all domestic revenue results from the sale of Basmati rice.[1] In both cases, PPRG opined that Amira had overstated its international Basmati sales. PPRG also analyzed Amira's domestic Basmati sales, and came to believe that the domestic revenue figure and thus the total revenue figure were both overstated. Feb. Rpt. at 7-12.

The February Report also reviewed market conditions, predictions regarding Basmati spreads, interviews with industry participants, related party relationships, transactions seemingly designed to mask the relationship between Amira and its founding family, the run-down (or non-existent) state of certain facilities, a real estate deal that looked like a sham, and executive compensation and accounting issues. Based on its total analysis, PPRG opined that the value of Amira's stock was $0.12 to $1.30 per share and set a target price of $0. *Id.* at 13-38.

Following the release of the February Report,[2] the price of Amira's stock declined and Amira alleges it cancelled a planned debt offering. AC ¶¶ 96, 98.

### *The July Report*

In an effort to rebut the February Report, Amira promptly disclosed a letter from KRBL, one of Amira's competitors. *Id.* ¶ 73. Then, in March 2015, Amira filed an SEC Form 6-K (the "March 6-K"), presenting "The Truth About Amira," and a "Deeper Look" at its sources of

---

[1] This second, more conservative approach assumes higher domestic and lower international figures for Basmati rice sales, which results in a smaller variance between PPRG's estimate and the APEDA figure. Even under this conservative analysis, however, PPRG still estimates Amira's international Basmati revenue was overstated by at least 52%. Feb. Rpt. at 9.

[2] Plaintiff's allegation that Asbahi completed the February Report and then "held it back," waiting for a damaging opportunity to release it, is demonstrably false. That report includes information available only immediately prior to its release. *E.g.* Feb. Rpt. at 27 (citing Form 6-K dated Jan. 28, 2015); *id.* at 17 (analyzing contemporaneous Basmati realization spread). *Koulkina v. City of New York*, 559 F.Supp.2d 300, 329 (S.D.N.Y. 2008) (allegations that contradict a document attached to the complaint need not be taken as true).

revenue, which disclosed that Amira sourced some rice from third parties "in India and internationally." *Id.* ¶ 64; *see also* Porter Decl. Ex. A.

PPRG's July Report analyzed the new information and held to its opinion that Amira's revenue was overstated. The July Report contended that if a significant percentage of Amira's Basmati sales was sourced from international third parties, as suggested in the March 6-K, then Amira's gross margins should be lower than reported. The July Report also presented further information about a conversation with a KRBL executive, to answer the letter released by Amira. July Rpt. at 10-13, 21. The July Report included interviews with former Amira personnel, observed that Amira's reported revenue suggested it had a 36% market share for total rice in the UAE, and compared the divergent growth vectors of Amira's gross margins and its Basmati realization spread, showing that its financial statements did not reflect market forces. *Id.* at 6-9, 23, 25.

The July Report is another detailed research report that sets forth the facts and methods of analysis that support its conclusions. Readers can and are encouraged to independently assess the opinions presented.

### *Amira Terminates its Independent Auditor*

In August 2015, Amira delayed filing its year-end financials and terminated its auditor, Deloitte, in response to the auditor's request for an independent investigation of the allegations in both the Reports, as well as "*other transactions*" Deloitte had identified during its incomplete audit. AC ¶¶ 114-16; Porter Decl. Ex. B at 2 (emphasis added). Amira engaged a new auditor, ASA, and retained BDO to conduct a review of *certain* of PPRG's allegations. While Amira ultimately reported that BDO concluded that the allegations it analyzed were "unsubstantiated and/or unfounded," it has failed to publicly disclose BDO's report. AC ¶¶ 116-19.

*Amira's Claims*

Plaintiff challenges the Reports for opining that Amira is (1) fabricating its financial reports by overstating international and domestic revenues; (2) failing fully to disclose related third parties; (3) planning a sham real estate transaction; and (4) other "red flag" conduct. AC ¶¶ 50-92. Plaintiff asserts claims for defamation, trade libel and injunctive relief under Section 10(b) of the Securities Exchange Act ("Section 10(b)").

## ARGUMENT

## I.   MOTION TO DISMISS STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). Where "well pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief," and the complaint should be dismissed. *Id.* at 679 (internal quotations omitted). A plaintiff must do more than provide "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atl.Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Conclusory allegations are not entitled to a presumption of truth.

Courts recognize that there is particular value in resolving defamation claims at the pleading stage, so as not to protract litigation and thereby chill the exercise of constitutionally protected freedoms. *E.g.*, *Biro v*. *Condé Nast,* 963 F. Supp. 2d 255, 264 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015), *and aff'd*, 622 F. App'x 67 (2d Cir. 2015).

## II.   PLAINTIFF FAILS TO PLEAD A CLAIM FOR DEFAMATION

The elements of a defamation claim are (1) a false statement, (2) published to a third party without authorization or privilege, (3) made with the applicable level of fault on the part of the speaker, (4) either causing special harm or constituting slander *per se*.   *E.g., Dillon v. City of*

*New York*, 704 N.Y.S.2d 1, 5 (1st Dep't 1999).  The "words must be construed in the context of the entire statement or publication as a whole, tested against the understanding of the average reader, and if not reasonably susceptible of a defamatory meaning, they are not actionable and cannot be made so by a strained or artificial construction." *Id.*

## A.  Expressions of Opinion Are Constitutionally Protected

Freedom of speech is a bedrock principle of constitutional law and it has long been recognized that defamation claims must be considered "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). The right to free speech is as essential to our economic system as it is to our political system. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc*., 425 U.S. 748, 765 (1976) (recognizing the free flow of information as indispensable to our free enterprise economy); *see also Reliance Ins. Co. v. Barron's*, 442 F. Supp. 1341, 1345 (S.D.N.Y. 1977) (recognizing that "[s]trong public policies exist in favor of the right to publish . . . critiques" regarding public offerings and that the ability to expose information about companies "is an important function of a free financial press, which should not be inhibited by judgments for  damages" for defamation).

Under the New York Constitution, statements of opinion receive "absolute protection" and cannot be the basis of a defamation claim. *E.g.*, *Egiazaryan v. Zalmayev*, 880 F. Supp. 2d 494, 503 (S.D.N.Y. 2012); *Brian v. Richardson*, 87 N.Y.2d 46, 50-51, 637 N.Y.S.2d 347, 350 (1995); *Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 252, 566 N.Y.S.2d 906, 916 (1991); *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 288-89, 508 N.Y.S.2d 901, 903 (1986). All statements of opinion are protected under New York law, not just those expressed as hyperbole or in some other manner that makes it blatantly obvious no actual facts are being conveyed. *Immuno*, 566

6

N.Y.S.2d at 917. Statements that are "seriously maintained" and have an "apparent basis in fact" must be afforded protection when the context and overall impact of the communication signal to the reader that what is being conveyed is opinion. *Id.*

**B.     Courts Focus on the Context as a Whole, Not Discrete Factual Assertions**

Whether a challenged statement expresses fact or opinion is a question the court must decide as a matter of law. *E.g.*, *Egiazaryan*, 880 F. Supp. 2d at 504. While there is no definitive set of criteria, "[t]he essential task is to decide whether the words complained of, considered in the context of the entire communication and of the circumstances in which they are spoken or written, may be reasonably understood as implying the assertion of undisclosed facts justifying the opinion." *Steinhilber*, 508 N.Y.S.2d at 904. *Accord Immuno*, 566 N.Y.S.2d at 916.

Four factors may be considered: (1) whether the statement at issue has a precise meaning so as to give rise to clear factual implications, (2) the degree to which the statements are verifiable, *i.e.*, objectively capable of proof or disproof, (3) whether the full context of the communication in which the statement appears signals to the reader its nature as opinion, and (4) whether the broader context of the communication so signals the reader. *E.g., Brian*, 637 N.Y.S.2d at 350; *Sandals Resorts Int'l Ltd. v. Google, Inc*., 925 N.Y.S.2d 407, 412 (1st Dep't 2011). It is clear, however, that context is the primary focus. *Egiazaryan*, 880 F. Supp. 2d at 504-07 (surveying cases and noting the determinative power of the contextual factors).

In conducting this analysis, the "court must consider the publication as a whole, and not pick out and isolate particular phrases." *Sabratek Corp. v. Keyser*, No. 99 CIV. 8589 (HB), 2000 WL 423529, at *7 (S.D.N.Y. Apr. 19, 2000) (citations omitted).  As the *Immuno* court explained,

> [A]n analysis that begins by looking at the content of the whole communication, its tone and apparent purpose better balances the values at stake than an analysis that first examines the challenged statements for express and implied factual assertions, and finds them actionable unless

> couched in loose, figurative or hyperbolic language in charged
> circumstances.

566 N.Y.S.2d at 917 (citations omitted); *see also Brian*, 637 N.Y.S.2d at 351 ("[r]ather than

sifting through a communication for the purpose of isolating and identifying assertions of fact,

the court should look to the over-all context in which the assertions were made"); *Mann v. Abel*,

10 N.Y.3d 271, 276-77, 856 N.Y.S.2d 31, 33 (2008).

These principles have been applied to claims remarkably similar to those asserted by

Amira. In *Silvercorp Metals Inc. v. Anthion Mgmt. LLC*, 959 N.Y.S.2d 92, 2012 WL 3569952

(N.Y. Sup. Ct. 2012) (table decision), plaintiff brought a defamation action against defendants

for allegedly publishing false statements in order to drive down plaintiff's stock and profit from a

short sale position. The court held the statements to be non-actionable, concluding that

defendants' disclosure of their short position would indicate to a reader that the author was

expressing an opinion. The tone of the statements, publication on the internet, use of linguistic

devices such as the word "belief," and the ability of readers to review the underlying facts and

form their own conclusions all supported the court's holding that the statements constituted

protected opinion.  In *Sabratek*, the court found that statements in a short seller's investment

newsletter were opinion, where the statements included the short seller's "reasoning for those

beliefs" and contained a preface that "clearly inform[ed] the reader that the information

presented include[d] 'expressions of opinion'." 2000 WL 423529, at *7.  *See also Nanoviricides,*

*Inc. v. Seeking Alpha, Inc*., Index No. 151908/2014, 2014 N.Y. Misc. LEXIS 2909 (N.Y. Sup.

Ct. Jun. 26, 2014) (article by short-seller providing 'strong sell' recommendation was pure

opinion, noting that courts should protect against corporations using court orders to "silence their

online critics, which threatens to stifle the free exchange of ideas.").

8

C.      **The February and July Reports Are Protected Opinion**

Here the content and context of the Reports make it perfectly clear to the reader that they

present PPRG's opinion, based on disclosed facts, assumptions, and methods of analysis. Both

Reports declare at the outset,

> This research report expresses our ***research opinions***, which we have ***based upon certain facts***, all of which are based upon publicly available information, and ***all of which are set out*** in this research report.

Feb. Rpt. at 3; July Rpt.at 3 (emphasis added). Indeed, the reader is repeatedly reminded through

both Reports that they set forth opinions.  Some representative language:

- "[W]e ***believe*** Amira Nature Foods i[s] fabricating the financials . . ."
- "We ***believe*** ANFI to be vastly overstating its reported revenue."
- "The following subsections ***will show how we came to estimate*** that a full 52.6% of ANFI's sale are suspect, indicating ***potential*** revenue overstatement of >100%."
- "Valuing Amira is not an easy task. We ***don't know*** how much of its revenue is real; we ***think*** a lot of it is fake."
- "We ***believe*** that ANFI's drawing power has fallen and it is potentially navigating a liquidity crunch . . ."

Feb. Rpt. at 5, 7, 38 (emphasis added); July Rpt. at 5 (emphasis added).  These expressions

signal that the challenged statements are opinion, not fact.  *Silvercorp,* 2012 WL 3569952, at *9.

Both Reports disclose, in great detail, the facts upon which the opinions are based,

provide hyperlinks to the cited materials, and set forth the calculations and analysis supporting

the opinions.  The analysis emphasizes the opinion nature of the Reports by walking readers

through its calculations using alternative assumptions.  *Compare* Feb. Rpt. at 8 (estimating

Basmati export revenue) *with id.* at 9 (conservative estimate of Basmati export revenue);

*compare id.* at 38 (valuation method 1) *with id.* at 39 (valuation method 2).

The context of the Reports further demonstrates that they present opinion. The Reports,

published on the internet and disseminated through Twitter, disclose that PPRG and/or its clients

or investors have a short position and "stand[] to realize significant gains in the event that the price of [Amira's] stock declines." Feb. Rpt. at 3; July Rpt. at 3. That stated motive, and the internet context, are clear signals that the author is expressing an opinion. *Silvercorp*, 2012 WL 3569952 at *9 (short-seller's disclosed motive indicated expression of opinion); *Sandals*, 925 N.Y.S.2d at 415–16 ("readers give less credence to allegedly defamatory remarks published on the Internet than to similar remarks made in other contexts"); *see also Brian*, 637 N.Y.S.2d at 350-52. This is also apparent given PPRG's call for an investigation. Feb. Rpt. at 9; *Vengroff v. Coyle*, 647 N.Y.S.2d 530, 531 (2d Dep't1996).

As the Amended Complaint establishes, the Reports were part of a public debate about Amira and the value of its stock. Before the February Report, other analysts published reports criticizing Amira's financial reporting. Feb. Rpt. at 23 (linking articles); Porter Decl. Exs. C, D. After the February Report, Amira contributed to the debate by disclosing a letter criticizing the February Report. AC ¶ 73; July Rpt. at 10; Porter Decl. Ex. E. And in what was clearly a further response to the February Report, Amira's March 6-K presented "The Truth About Amira," including a "Deeper Look" at its sources of revenue that disclosed its sale of rice provided by third parties. *See* Porter Decl. Ex. A. In turn, PPRG's July Report analyzed the new information in the March 6-K, as well as the publicly disclosed letter. *See* July Rpt. at 10, 13-18, 21. Amira, in its 2012 IPO prospectus, anticipated this public debate, advising investors, that the "trading market for [Amira's] ordinary shares will rely in part on the research and reports that securities and industry research analysts publish about [Amira]" and that the "stock price and trading volumes could decline if one or more securities or industry analysts downgrade [the] ordinary shares, [or] issue unfavorable commentary about [Amira] . . . ." Porter Decl. Ex. F at 36.

### D. Plaintiff's Allegations Fail To Support a Defamation Claim

Amira claims that the Reports rely on "several misstatements of fact" and a "selective picture of the facts" to conduct "a series of convoluted calculations" to arrive at their opinions. Plaintiff identifies nineteen purported "primary misstatements" in the February Report, falling into five categories, and sets forth a dense and detailed counter-analysis.[3] AC ¶¶ 50-92.

It is not necessary for the Court to "sift through" the allegedly "false factual assertions" because the content of the Reports, viewed as a whole, establishes that they are non-actionable expressions of opinion. *Mann*, 856 N.Y.S.2d at 33. Nevertheless, an examination of Amira's assertions and counter-analysis only confirms that the Reports are not actionable. Indeed, Plaintiff's ability to present a detailed counter-analysis demonstrates that the opinions in the Reports are based on disclosed facts. The Amended Complaint is an extended attempt to refute select aspects of the Reports, debating the analysis, *e.g.*, AC ¶ 63, and asserting that other sources should have been consulted, *e.g.*, *id.* ¶¶ 68-9, or other facts included, *e.g.*, *id.* ¶¶ 57, 84, 72. The Amended Complaint presents a valuation debate, not a valid defamation claim.

### 1. International Revenue

Plaintiff challenges the thesis that Amira overstated its international revenues by debating aspects of PPRG's analysis, not by identifying false statements. AC ¶¶ 52-65. The key issue is international sales of Basmati, a figure Amira does not disclose separately and which PPRG therefore estimated based on fully disclosed facts and methodology. Amira does not dispute those calculations (or allege what the "correct" figure should be), but only disputes whether it is fair to compare the result to the APEDA data. Amira asserts that the APEDA export data cannot be used for an "apples to apples" comparison, but fails to allege any meaningful difference that

---

[3] Plaintiff's chart of the "primary misstatements" is telling. AC ¶ 51. Many are not statements by PPRG (rather, they appear to be topic areas identified by Plaintiff), many are obvious opinion, and some are clearly identified as assumptions.

would materially undermine the Reports.  Plaintiff avers that APEDA values Basmati exports "free on board' ("FOB"), but that fact was disclosed in the February Report and analyzed in detail in the July Report.  *See* Feb. Rpt. at 8; July Rpt. at 15, 18.  Plaintiff does not challenge PPRG's analysis respecting FOB; Plaintiff does not even set forth the sale price, or allege that any variance between the sale price and the FOB value would be material.  Significantly, Amira does not challenge the fact that the international Basmati sales of *other* Indian rice exporters *do* match those exporters' APEDA data.  *See* Feb. Rpt. at 9.

Plaintiff's claims that APEDA employs a "narrow definition of Basmati that does not include all rice that Amira exports from India," and does not capture "all the sources" from which Amira derives international revenue are unavailing.  AC ¶¶ 52, 56-58.  The Reports do not purport to compare international revenue from all of Amira's "rice" or "product mix" to the APEDA data, only the subset attributable *to Basmati*.  Moreover, Plaintiff does not allege that it uses a looser definition of Basmati than does APEDA for purposes of recording its Basmati versus non-Basmati revenues, much less that the non-Basmati (per APEDA) products account for a material portion of Amira's reported revenue from Basmati.[4]

Amira does not plausibly allege that the Reports relied on any false facts or undisclosed facts. Several of the "statements" Plaintiff challenges misquote and misconstrue the Reports. Plaintiff misleadingly challenges certain "statements" that were actually "*assumptions,*" and clearly identified as such *precisely so* that readers could understand the bases for the opinions and assess them accordingly.  *E.g.* AC ¶ 60 (citing to Feb. Rpt. at 8 ("we assume . . ."); *id.* at 12 ("PP estimates . . .")).

---

[4] Plaintiff's allegations on this point are remarkably vague.  Plaintiff gives the volume of non-Basmati rice exports for all of India, but not for Amira.  And Plaintiff alleges that it sells various "blends and mixes" which "may" be recognized as Basmati in "some geographies," though not by APEDA, but does not appear to state that revenue from such products is counted as revenue from "Basmati" in its financial statements.  AC ¶¶ 56-57.

Amira disputes PPRG's belief that "all Basmati rice sold to international customers is exported by Amira Pure Foods, [an Indian subsidiary of Amira], directly to the customer" was corroborated "in conversations with ANFI's current CFO [Bruce Wacha]."  AC ¶¶ 61-62.  According to Amira, Mr. Wacha "did not, and never would have, 'corroborated' this statement" because it would not be feasible for Amira to ship directly to its numerous international customers from its India-based factory.  *Id.* ¶ 62.  Amira's allegations come down to a difference of opinion about whether Mr. Wacha's statements, which are quoted in the July Report and *not* the Amended Complaint, corroborate PPRG's analysis. The July Report quotes Mr. Wacha as stating, in substance, that Amira's Indian subsidiary sells all of its Basmati rice to international subsidiaries and then distributes it to the end customers after export from India.  *See* July Rpt. at 17.  Amira does not deny that Mr. Wacha made this statement.[5]  It simply disagrees with PPRG's reasonable conclusion that it is consistent with the understanding that Amira's Basmati rice exports go through India and should therefore be reflected in the APEDA export data.[6]

Finally, Plaintiff contends that PPRG failed to account for product that was sourced from third parties in India or internationally.  AC ¶ 64.  But this contention is based on the March 6-K, which was disclosed *after* the February Report was published.  Moreover, PPRG thoroughly

---

[5] Nor does Plaintiff challenge the statements by Rahul Nayar (the brother in law of Amira's CEO who ran Amira's IPO), quoted in the July Report, that Basmati rice is made in India and "shipped from India by Amira Pure Foods, to the customer directly.  The billing may go through Amira DMCC as a matter of business … But all the rice actually comes from India itself, right?"  July Rpt. at 6, 15.

[6] Amira also argues that Mr. Wacha did not make the statement that "all of Amira's exports will pass through its Indian facility and Amira Pure Foods has control of the product" because Amira's factory has reached full capacity and Amira uses outsourcing techniques.  AC ¶ 109.  This allegation is highly disingenuous.  The language Plaintiff quotes is clearly identified as PPRG's *take-away* from its conversation with Mr. Wacha.  July Rpt. at 17.  PPRG provided direct quotes from the conversation, and Plaintiff *does not dispute* that Mr. Wacha made the statements attributed to him in the Report.  Indeed, the conversation with Mr. Wacha quoted in the July Report directly discusses the factory being at capacity and the outsourcing techniques.

dissected this new information in its July Report and maintained its opinion that Amira's revenue was overstated. *See* July Rpt. at 13-18, 21.[7]

### 2.   Domestic Revenue

As with the international revenue, Plaintiff's challenge to PPRG's position on Amira's gross margin and domestic revenue is a dispute over the validity of an opinion, not the truth of the underlying facts.   First, Plaintiff argues that it does not report a gross margin line and therefore PPRG's statement that Amira's margin profile does not match those of its competitors must be false.  AC ¶ 68.[8] But, Amira does not deny the accuracy of the gross margin figure (or those of its competitors) and the February Report identifies its source for that figure.  *See* Feb. Rpt. at 10, 17.   Nor does Plaintiff allege that gross margin cannot be determined from reported information if a company follows Indian GAAP, or IFRS.

Second, Plaintiff challenges PPRG's view that domestic revenues were overstated as resting on two allegedly faulty assumptions: (1) an underestimated domestic market size, and (2) all of Amira's sales in India are made from branded Basmati rice.  AC ¶¶ 69-71.   Amira argues that the market size estimate is derived from an outdated survey, but misstates how PPRG made that estimate.[9] In fact, as disclosed, PPRG "back[ed] into a total branded Basmati market" figure using information from KRBL. *See* Feb. Rpt. at 11.   PPRG's assumption that Amira's

---

[7] Plaintiff acknowledges that the APEDA data used by PPRG shows the total export turnover of Basmati rice sold by Amira India, AC ¶ 59, and the only international subsidiary distributor identified by Plaintiff, Basmati Rice GmbH, comprises a tiny fraction of Amira's sales.  AC ¶¶ 24, 64 (alleging that Basmati Rice GmbH reported only $9 million in calendar 2013, compared to Amira's revenues of $414 million for the same year).  Moreover, as discussed in the July Report, recording sales by third parties in Amira's name would be improper.  July Rpt. at 13.

[8] Plaintiff's related allegation that "Amira does not, and is not required to, disclose domestic revenue in its SEC filings," AC ¶ 68, is contradicted by other allegations in the Amended Complaint, *e.g.*, *id.* ¶ 26.

[9] The articles that Plaintiff proposes as alternate sources regarding the domestic branded Basmati rice market in India are not on point.  They relate to Basmati rice *or* branded rice, but not branded Basmati rice. AC ¶ 69 n.36.  *See* Porter Decl. G at 2 ("The domestic ***basmati rice*** market is estimated at Rs 10,000 crore"); Porter Decl. H at 3 (same); Porter Decl. I at 3 ("According to the Rabobank report, though the share of ***branded rice*** in the ***overall domestic rice market*** is small in terms of volume, in terms of value it is expected to increase by $1.1 billion to reach $3.5 billion by 2017. Consumption of branded rice is growing in both southern and northern India. However, the grains being sold in the south are smaller in size and are ***mainly non-basmati***.") (emphasis added).

domestic sales are branded Basmati is disclosed, *see* Feb. Rpt. at 12, and based on Amira's filings. *See* Porter Decl. Ex. J at 42.  Amira fails to allege how much of its domestic revenue is derived from "other food products," or if such amount would materially affect PPRG's analysis of the "suspect" domestic sales.  Feb. Rpt. at 12.

Third, Amira challenges PPRG's view that Amira's production capacity is not in line with its generated revenue when compared to its peers, arguing that Amira used "third party processing facilities to meet its production requirements," and that the use of third party processing facilities should have been disclosed in the February Report.  AC ¶ 72.  But PPRG discussed the use of outsourcing third-party processing in the July Report, and Amira does not dispute that it processes approximately 2/3 of its rice at its facility, *see* July Rpt. at 16, or that its processing capacity is only 24 MT/hour, as compared to the higher capacity of its peers, *see* Feb. Rpt. at 10.[10]  Moreover, the July Report included quotes from Amira's CEO recognizing the relationship between production capacity and gross margins. *See* July Rpt. at 16.

Fourth, Amira challenges PPRG's reliance on a "KRBL key executive" regarding Amira's 5% market share, arguing that KRBL's Chairman stated in a subsequent letter that "no one from KRBL ever spoke with PPRG or made any of the statements attributed to KRBL." AC ¶ 73.  The actual language of the letter makes clear that it only denied that KRBL *as an entity* made these statements. *Id.* n.41. Plaintiff ignores the fact that the July Report identified the executive as KRBL's CFO and does not allege that the CFO has disavowed the statements.

### 3.    Related Party Transactions

Plaintiff alleges that it has disclosed all of its post-IPO related party transactions, contrary to statements in the February Report.  AC ¶¶ 74-82. Plaintiff does not dispute that transactions

---

[10] The additional 1/3 of the rice that is processed using third party outsourcing, still does bring Amira's processing capacity close to its peers identified in the February Report, which range from 195 MT/hour to 60 MT/hour.  *See* Feb. Rpt. at 10.

with Karam Enterprises would constitute related party transactions.  Nor does Plaintiff dispute that Amira and Karam deleted mention of each other on their respective websites after their related party relationship was made public, or that Amira and Karam have failed to acknowledge or address these issues since they were revealed.  Plaintiff does not deny that its former CFO, Mr. Suneja, reportedly had concerns that "ANFI has related party transaction issues."  Feb. Rpt. at 34.  Rather, Plaintiff contends that the basis for PPRG's opinion that post-IPO transactions have occurred – a conversation with former Amira audit committee member Daniel Malina – is flawed because Mr. Malina "did not speak with anyone who identified him or herself as being associated with or working on behalf of PPRG or any PPRG-related entity, nor did he claim that Karam was the largest customer of Amira post-IPO or otherwise claim that Amira was committing fraud."  AC ¶ 79.  In the original complaint, Plaintiff made this allegation "on information and belief."  *See* Compl. ¶ 88.  In its Amended Complaint, Plaintiff replaced "information and belief" with the equally vague phrase "Amira's investigation . . . indicates." AC ¶ 79. Regardless of the wording, this hedge is significant.[11]  After speaking with Mr. Malina, and amending its complaint, Plaintiff still fails to allege that Mr. Malina disavows making the relevant statement.   The other challenges respecting related party transactions misquote the Reports and do not allege any statement in the Report is false.[12]

---

[11] *JBCHoldings NY, LLC v. Pakter*, 931 F.Supp.2d 514, 527 (S.D.N.Y.2013) (allegations based upon information or belief must be accompanied by a statement of the facts upon which the belief is founded and must be more than mere conjecture and speculation); *see also Sabratek*, 2000 WL 423529, at *3-4 (conclusory allegations "on information and belief" and "based 'upon . . . investigation'" failed to support Section 10(b) claim).

[12] Plaintiff challenges PPRG's opinion that Amira has engaged in related party transactions with Gautam TechAgro India Pvt Ltd. and that other entities operate from within Amira's headquarters, use Amira email addresses, are directed by the CEO or his wife, and are in the business of distributing rice. AC ¶¶ 80-81. Plaintiff misstates the Reports and does not allege any false facts. PPRG did not claim that Gautam was related under any regulation, and Plaintiff does not challenge PPRG's description of Gautam as one of Amira's largest suppliers, or dispute that the source, which was identified and hyperlinked in the Report, described Gautam as a national distributor for Amira. Similarly, PPRG did not claim that the "other entities" conducted business with Amira, and Plaintiff does not deny PPRG's description, including PPRG's assessment that the other entities operate out of Amira's headquarters, use Amira's email addresses, and distribute rice.  Finally PPRG's comments regarding Amira's relationship with Amira Enterprises are unmistakably expressions of opinion. *Id.* ¶ 82.

### 4.    "Sham" Real Estate Transaction

Amira challenges PPRG's opinion that a proposed real estate transaction was a "sham." According to Amira, asserting that it received an independent valuation and independent board members approved the transaction is sufficient to belie the Report.   AC ¶¶ 83-85.  But the February Report provided a hyperlink to the Amira SEC Form 6-K disclosing this information, and PPRG's opinion is based on four facts, all disclosed and none alleged to be false: (1) the land was purchased by Amira's CEO in 2009-2010 for developing commercial real estate but is being repurposed because that plan went bust; (2) Amira's CEO will reap a return of more than 500%; (3) the property is significantly overvalued based on a benchmark of property in the same area; and (4) Amira does not need the land.  *See* Feb. Rpt. at 27.  Moreover, Plaintiff no longer alleges it needs the land and does not deny the statements by Mr. Mishra cited by PPRG, but only tries to minimize them on the grounds that his employment predated the IPO.  AC ¶ 85.

### 5.    Other "Red Flag" Issues

Amira challenges certain "red flags" identified by PPRG, but each challenge is a red herring.[13] AC ¶¶ 86-92.  First, Plaintiff challenges a chart in the February Report documenting CFO and auditor turn over.  Plaintiff does not allege that the information in the chart is false, only that the table should have included *other* information as well.  Amira quibbles that the chart should have marked the date of the IPO and said that Grant Thornton resigned by "mutual agree[ment]," instead of "resigned."  *Id.* ¶¶ 88-89.  That is not falsity.  Second, Plaintiff asserts that PPRG "falsely" claims that Amira is "constantly" issuing debt and equity. *Id.* ¶ 90. But the

---

[13] Plaintiff does not challenge numerous other opinions in the Reports, including: (1) the reported export rice sales for Amira's competitors, KRBL and LT Foods, line up with their reported APEDA data, (2) independent third party research firms were not recognizing Amira, (3) ~95% of ANFI's international sales are from unbranded, low-margin commodities, (4) narrowing paddy-Basmati pricing spreads lead to gross margin contraction and the Basmati realization spread is in the midst of sustained decline, (5) it is common industry practice for rice exporters to inflate turn over, (6) executives are excessively compensated and the divergence between the CEO's pre-IPO and post-IPO salary is enormous, and (7) valuation for ANFI is somewhere between $0.12/share and $1.30/share.

February Report does not make such a claim.  It presents a chart that accurately depicts Amira's

debt and equity issuance. Feb. Rpt. at 18.[14]  Third, Plaintiff claims that PPRG falsely stated that

Daniel Malina resigned after serving for only three months, and implies the resignation was due

to ethical concerns.  AC ¶ 91.  The alleged error regarding Mr. Malina's tenure, however, does

not render the gist of PPRG's opinion untrue, *Egiazaryan*, 880 F. Supp. 2d at 504, and the

February Report clearly stated that, with respect to his resignation, Mr. Malina "told [PPRG] his

back was hurting from international travel."  Feb. Rpt. at 35.  Fourth, Plaintiff observes that

PPRG noted that Mr. Mishra had "concern[s] with ethical practices at the company" and that Mr.

Suneja stated that "ANFI has related party transaction issues."  AC ¶ 92 (quoting Feb. Rpt. at

34).  Plaintiff does not, however, deny that such statements were made or allege that the

statements are false.

### E.     Plaintiff Fails To Plead Actual Malice with Sufficient Facts

Amira's defamation claim is fatally flawed because the Amended Complaint does not

allege specific facts to support a claim that the Reports were published with constitutional

"actual malice."  Having publicly solicited investments with its IPO and the debt offering, Amira

is a public figure, at least with respect to its revenues and financial condition. *See, e.g.*, *Reliance*

*Ins. Co.*, 442 F.Supp. at 1348.  Thus, under the First Amendment, to state a defamation claim,

Amira must plead facts sufficient to show that the Reports were published with "actual malice,"

that is, PPRG subjectively knew at the time of publication that the challenged statements were

false or "in fact entertained serious doubts" as to their truth. *E.g.*, *St. Amant v. Thompson*, 390

U.S. 727, 731 (1968).  The claim is subject to the "more robust" *Iqbal* pleading standard

requiring non-conclusory allegations that rise to the level of plausibility.  *Biro*, 963 F. Supp. 2d at

---

[14] The Report accurately shows only one equity issuance – Amira's IPO. Amira ignores the fact that the chart clearly reflects a trailing twelve-month period.  And Amira does not allege that the chart's presentation of Amira's debt misrepresents the borrowings from the credit facility.

278-80 ("pleading 'actual malice buzzwords' is simply not enough to nudge a case into discovery"). Plaintiff's repeated, conclusory use of words such as "knowing" fails to meet this standard. *E.g.*, AC ¶¶ 1, 55, 56, 60, 67, 87. Plaintiff fails to identify material false statements of fact, let alone false statements that were known to be false or actually doubted when made.

### F.     Plaintiff's Defamation by Implication Claim Fails

Plaintiff's claim of defamation by implication does not apply to the Reports. Defamation by implication "is premised not on direct statements but on false suggestions, impressions and implications arising from otherwise truthful statements." *Stepanov v. Dow Jones & Co*., 987 N.Y.S.2d 37, 42 (1st Dep't 2014) (quoting *Armstrong v. Simon & Schuster*, 85 N.Y.2d 373, 380-81, 625 N.Y.S.2d 477, 481 (1995)). Here, however, as Plaintiff's own allegations and the Reports make clear, the challenged statements – that Amira is overstating its revenues and is involved in other alleged misconduct – are not implied. They are stated directly. In addition, the claim is barred by the subsidiary meaning doctrine, which prevents Plaintiff from bringing a "defamation action on subsidiary statements whose ultimate defamatory implications are themselves not actionable" because they "merely imply the same view, and are simply an outgrowth of and subsidiary to those claims upon which it has been held there can be no recovery." *Herbert v. Lando*, 781 F.2d 298, 312 (2d Cir. 1986).

## III.    PLAINTIFF FAILS TO PLEAD A TRADE LIBEL CLAIM

### A.     The Claim Is Based on Opinion and Plaintiff Fails To Plead Actual Malice

For the reasons discussed above, the trade libel claim is deficient because the challenged statements are constitutionally protected opinion, *see, e.g., Themed Restaurants, Inc. v. Zagat Survey*, *LLC*, 801 N.Y.S.2d 38 (1st Dep't 2005); *Silvercorp*, 2012 WL 3569952, and because actual malice is not adequately pled, *Drug Research Corp. v. Curtis Publ'g Co.*, 7 N.Y.2d 435,

439, 199 N.Y.S.2d 33, 36 (1960); *Diario El Pais, S.L. v. The Nielsen Co*., No. 07CV11295(HB),

2008 WL 4833012, at *6 (S.D.N.Y. Nov. 6, 2008).

**B.      The Challenged Reports Do Not Impugn Amira's Products**

The trade libel claim also fails because the Reports question Amira's overall financial

condition and management, not the quality or vendibility of its products. Alleged defamation of a

company's integrity and business methods is grounds for a defamation claim (if anything), not

trade libel. *Drug Research Corp*, 199 N.Y.S.2d at 37; *Henneberry v. Sumitomo Corp. of Am.*, 415

F. Supp. 2d 423, 471-72 (S.D.N.Y. 2006).

**C.      Plaintiff Fails To Plead Special Damages**

To state a trade libel claim, the challenged communication must "play a material and

substantial part in inducing others not to deal with the plaintiff, with the result that special

damages, in the form of lost dealings are incurred." *Waste Distillation Tech., Inc. v. Blasland &*

*Bouck Eng'rs, P.C*., 523 N.Y.S.2d 875, 877 (2d Dep't 1988).  A complaint must plead special

damages caused by the alleged tortious act. *Drug Research*, 199 N.Y.S.2d at 37.  Here, Amira

alleges that it has incurred special damages of no less than $11.75 million due to allegedly

having to: (1) defend itself against a class action lawsuit; (2) conduct external investigations;

(3) pay fees associated with the canceled Debt Offering; (4) pay higher costs of capital; and (5)

pay higher insurance premiums.  AC ¶ 152.  The nature of the purported damages further

demonstrates that they are not related to Amira's rice products, and cannot support a trade libel

claim.  *C.f. Bilinski v. Keith Haring Found., Inc*., 632 F. App'x 637, 641 (2d Cir. 2015) (to assert

special damages based on lost sales, a plaintiff must both name "the individuals 'who ceased to

be customers, or who refused to purchase,' " and itemize "the exact damages").  In addition, the

alleged damages were not the "natural and immediate" consequences of the allegedly defamatory

statements.  *Angio-Med. Corp. v. Eli Lilly & Co*., 720 F. Supp. 269, 274 (S.D.N.Y. 1989).

## IV.    PLAINTIFF FAILS TO PLEAD A SECURITIES EXCHANGE ACT CLAIM

### A.    Plaintiff Lacks Standing

Amira is not a "purchaser" or "seller" as required to have standing to state a claim under Section 10(b). The Second Circuit has not decided whether Section 10(b) claims for injunctive relief may be brought by one who was neither a purchaser nor seller of securities. The district courts are split, *see Cartica Mgmt., LLC v. Corpbanca, S.A.*, 50 F. Supp. 3d 477, 486 (S.D.N.Y. 2014), *appeal withdrawn* (Dec. 19, 2014), but the better-reasoned decisions hold that the Supreme Court's decision in *Blue Chip*, which requires that one be a "purchaser" or "seller" to state a claim for monetary damages, applies equally to claims for injunctive relief. *See Global Intellicom, Inc. v. Thomson Kernaghan & Co.*, No. 99 CIV 342 (DLC), 1999 WL 544708, at *8-9 (S.D.N.Y. July 27, 1999) (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730–31 (1975)); *Cartica*, 50 F. Supp. 3d at 492.

### B.    The Injunction Sought Would Be Unconstitutional

The securities claim is a non-starter because the injunction Amira seeks would be unconstitutional. There is a heavy constitutional presumption against such prior restraints on speech. *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. and Rest. Emps. Int'l Union*, 239 F.3d 172, 176 (2d Cir. 2001). Prior restraints are the most serious and the least tolerable infringement on free speech. *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Courts have long held that injunctions should not issue in defamation cases absent extraordinary circumstances. *Metro. Opera*, 239 F.3d at 176. Here, the proposed injunction, which would restrain all future speech by Defendants that might be determined to be false or defamatory, is impermissibly vague. *Id.* In addition, courts have long held that equity will not enjoin a libel. *Neb. Press Ass'n*, 427 U.S. at 559; *Metro. Opera*, 239 F.3d at 176.

### C.      Plaintiff Fails To Plead a Section 10(b) Claim

Even if Amira had standing, and the relief sought was not prohibited by the Constitution, the Amended Complaint fails to state a claim under Section 10(b). Plaintiff must allege that defendant: (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiff relied; and (5) that plaintiff's reliance was the proximate cause of its injury.  *E.g., Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 153 (2d Cir. 2007).  Section 10(b) claims are subject to heightened pleading requirements. First, the complaint must "state with particularity the circumstances constituting the fraud." Fed. R. Civ. P. 9(b). Second, the Private Securities Litigation Reform Act ("PSLRA") requires that the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).  Moreover, a Section 10(b) claim should not be used to circumvent the higher evidentiary threshold applicable to defamation claims.  *Reliance Ins. Co*., 442 F. Supp. at 1353.

### 1.      Plaintiff Fails To Allege any Material Misrepresentation

To allege that a statement of opinion or belief is false within the meaning of the federal securities laws, plaintiff must plead facts that, if true, would show one of the following: (1) the speaker did not hold the opinion or belief professed, or the supporting facts supplied were untrue, or (2) the opinion or belief is misleading due to the omission of information "whose omission makes the statement misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (*citing Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1325-28 (2015)). "A statement of opinion is not misleading just because external facts show the opinion to be incorrect' and 'is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." *Omnicare*, 135 S. Ct. at 1328-29.

Furthermore, in considering whether an opinion is misleading, the "customs and practices of the relevant industry" must be taken into account, and the statement must be viewed in its proper context. *Tongue*, 816 F.3d at 210.

Plaintiff fails to meet either prong. Amira does not make factual allegations showing that any Defendant did not believe the truth of the Reports. To the contrary, both Reports state: "[t]o the best of our ability and belief, as of the date hereof, all information contained herein is accurate and reliable and does not omit to state material facts necessary to make the statements herein not misleading, and all information has been obtained from public sources we believe to be accurate and reliable . . . ." Feb. Rpt. at 3; July Rpt. at 3. Indeed, Amira alleges that Defendants continue to stand by the Reports. *E.g.*, AC ¶ 33 n.16. And the allegation that Defendants continued to maintain a short position in Amira's stock as of April 26, 2016 – approximately *eight months after* the publication of the last Report – indicates Defendants' belief in the truth of the thesis. *Id.* ¶ 129. The context of the statements also weighs against finding them misleading. The Reports expressly encouraged readers to do their own analysis and provided the means for them to do so. *See Tongue*, 816 F.3d at 211. *See also Harris v. AmTrust Fin'l Servs., Inc.*, 135 F. Supp. 3d 155, 173 (S.D.N.Y. 2015), *aff'd*, 2016 WL 2848685 (2d Cir. May 16, 2016) (a "difference of opinion" regarding financial disclosures is not a misrepresentation).

### 2.        Plaintiff Fails To Allege Scienter

Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007). Scienter "may be established by facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or

recklessness." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014). Under the PSLRA's heightened pleading requirement, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs, Inc*. 551 U.S. at 324. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* If the inference of scienter is merely plausible or reasonable, the complaint should be dismissed. *Id.* at 314.

Amira's allegations of scienter are based on the Defendants' ability to profit from their short position. Although allegations of "motive and opportunity" are relevant, standing alone they do not suffice to raise the requisite strong inference of scienter. *Sabratek*, 2000 WL 423529, at *4 (dismissing Section 10(b) claim as alleged motivation of short seller was insufficient to raise strong inference of scienter); *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 428 (S.D.N.Y. 2010) ("generalized motive to earn 'profits' is insufficient to allege scienter").    Neither do Amira's allegations permit a finding of conscious misbehavior or recklessness.  Recklessness in the securities fraud context is "not merely a heightened form of negligence," but a "state of mind approximating actual intent." *Russo v. Bruce*, 777 F. Supp. 2d 505, 520 (S.D.N.Y. 2011) (*quoting S. Cherry St., LLC v. Hennessee Grp., LLC*, 573 F.3d 98, 109 (2d Cir. 2009)).  Here, the Reports demonstrate PPRG's conscientious effort to analyze the relevant information, not recklessness approximating fraud.

### 3.    Plaintiff Fails To Allege Reliance

Plaintiff cannot allege that it relied on the Reports, as it claims it considered the challenged statements to be false. Nor can Plaintiff invoke alleged reliance by *others* on alleged misrepresentations in selling their shares.  *Salvani v. ADVFN PLC*, 50 F. Supp. 3d 459, 471-72

(S.D.N.Y. 2014) *aff'd sub nom. Salvani v. InvestorsHub.com, Inc.*, 628 F. App'x 784 (2d Cir. Oct. 9, 2015) (plaintiff could not point to other investors that sold shares to establish reliance through the fraud on the market theory as they always knew defendants' misrepresentations to be false); *Tiberius Capital, LLC v. PetroSearch Energy Corp.*, No. 09 CV. 10270 (GBD), 2011 WL 1334839, at *6 (S.D.N.Y. Mar. 31, 2011*), aff'd*, 485 F. App'x 490 (2d Cir. 2012) (plaintiff could not establish reliance through the fraud on the market theory because it "affirmatively disbelieved" defendants' misrepresentations at the time it sold its shares).

### 4.    Plaintiff Fails To Allege Causation

To establish loss causation, there must be an allegation that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.  *Salvani*, 50 F. Supp. 3d at 474 (*citing Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005)).  Here, as in *Salvani*, Plaintiff fails to allege loss causation because it claims that PPRG's allegedly defamatory statements themselves – not a risk previously concealed or a subsequent revealing event – led to the decline in Amira's stock price.  *Id.* at 476 (finding loss causation insufficiently pled where plaintiff alleged defamatory statements were posted on online message board, damaging plaintiff's business and causing stock held by plaintiff to decline); *see also Harris*, 135 F.Supp.3d at 173 n.30.

### CONCLUSION

For the reasons stated above, the Court should dismiss the Amended Complaint in its entirety, with prejudice, together with such other relief as the Court deems just and proper.

Dated: May 25, 2016

Respectfully submitted,

*/s/ Douglass B. Maynard*
Michael A. Asaro
Douglass B. Maynard
Katherine Porter
Sydney Spector
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email: masaro@akingump.com
         dmaynard@akingump.com
         kporter@akingump.com
         sspector@akingump.com

*Counsel for the Defendants*